IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CRIMINAL NO. SAG-24-0120 |
| WILLIAM SHEROD | * | |
| Defendant. | * | |

******

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS

The United States of America respectfully submits this response in opposition to the defendant's pretrial motions to suppress evidence as follows: Motion to Suppress Evidence Obtained Pursuant to Geofence Warrant (ECF 104) and Motion to Suppress Evidence Obtained Pursuant to Tower-Dump Warrants (ECF 105). Those motions are without merit and the Court should deny them.

I.   **FACTUAL BACKGROUND**

A.  **Howard County and Baltimore County Pharmacy Burglaries**

On January 5, 2022, at approximately 3:30 am, Feldman's Medical Center Pharmacy located at 11055 Little Patuxent Parkway in Columbia, Maryland was burglarized. Surveillance footage showed two masked suspects dressed in dark clothing exit a 4-door white Honda Civic and gain entry by prying open the front door to the business. One suspect carried a silver Halligan[1] bar and wore black gloves and black sneakers. The second suspect carried a blue pry bar and wore purple

---

[1] A Halligan is a multipurpose tool used for prying, twisting, and striking. Invented by a New York City fireman, it is useful in quickly breaching locked doors. https://en.wikipedia.org/wiki/Halligan_bar (last visited May 3, 2025).

gloves and white/grey sneakers. Fifty dollars in U.S. currency and a trash can from inside the pharmacy were taken. The suspects exited the building at 3:33 am.

Then at 4:00 am, the Catonsville Pharmacy located at 6350 Frederick Road in Catonsville, Maryland was burglarized. A neighboring business camera captured the suspect vehicle, a white Honda with a sunroof. Like the Feldman's burglary, the suspects gained entry by prying open the door to the business. There were no interior surveillance cameras to capture suspects' descriptions, and the suspects parked off exterior camera view.

On January 14, 2022, at approximately, 2:00 am, two suspects attempted to enter the Rehya Pharmacy located at 405 Frederick Road in Catonsville, Maryland. The suspects tried to pry open the door to the pharmacy using a silver Halligan pry bar and a blue pry bar but were unsuccessful. The surveillance video showed the suspects wearing similar clothing to the suspects in the Howard County burglary and it also captured the license plate of the suspect vehicle, a white Honda Civic with a sunroof and MD tag 8DN3476. Detectives conducted a check of the registration and met with the owner of the tag, who stated that the tag had been stolen sometime between 1/11/2022 and 1/14/2022.

B. **Montgomery County and Charles County Pharmacy Burglaries**

Also on January 14, 2022, at approximately 2:38 am, the Medicine Shoppe Pharmacy located at 10313 Georgia Ave, Silver Spring, Maryland was burglarized. Surveillance footage showed two suspects wearing dark hoodies and black pants using a Halligan pry bar to gain entry. The clothing appeared to match that worn by the suspects in the attempted burglary at the Rehya Pharmacy. The suspect vehicle was a white Honda (police report describes it as an Accord) with a sunroof displaying stolen MD Tag 8DN3476.

Then at 3:43 am, Pembrooke Pharmacy located at 11355 Pembrooke Square in Waldorf, Maryland was burglarized. Surveillance video showed two suspects gain entry through the use of a Halligan bar and the suspects appeared to be `wearing the same clothing as the suspects in the Medicine Shoppe Pharmacy surveillance video. The suspects stole approximately $1,557 worth of Oxycodone (Schedule II), Promethazine-Codeine (Schedule V) and $200 in U.S. currency. The suspects emptied a trash can from inside the business and threw items inside. A red-light camera captured a white 4-door Honda Civic MD tag 8DN3476 (same vehicle that was used in the Reyha Pharmacy burglary and the Medicine Shoppe burglary) near the shopping center at approximately 3:35 am.

### C. Albemarle County, Augusta County, Rockingham County Pharmacy Burglaries

On January 19, 2022, 1:57 am, the UVA Pharmacy Pantops located at 590 Peter Jefferson Parkway, Charlottesville, Virginia (Albemarle County) was burglarized. Two black male suspects, one dressed in all back with red sneakers and red gloves armed with a silver Halligan bar, one dressed in all black with gray Nike sneakers with blue/purple gloves armed with a blue pry bar, broke into the business. The suspects stole approximately $1111.53 worth of controlled substances including Hydrocodone-Acetaminophen (Schedule II), Oxycodone HCL (Schedule II) and Promethazine-Codeine syrup (Schedule V). Surveillance video showed the suspects place the drugs into a yellow bucket from the pharmacy and exit the business in two minutes. There was no exterior video surveillance to capture a suspect vehicle.

Then, at 2:37 am, Fisherville Family Pharmacy located at 16 Gosnell Crossing, Unit 101, Staunton, VA (Augusta County) was burglarized. Outside surveillance showed a white Honda with a sunroof arrive and park in front of business. The vehicle bore a Virginia tag ending in 3174. Two suspects dressed in all black, one wearing red gloves, one wearing blue/purple gloves, one

with black sneakers, other suspect wearing gray and white sneakers, can be seen on surveillance video prying open front door of business with a silver Halligan tool and a blue pry bar. The suspects took one bottle of Promethazine-Codeine syrup (Schedule V).

At 3:34 am, Medicap Pharmacy located at 1851 Virginia Avenue in Harrisonburg, Virginia (Rockingham County) was burglarized. Surveillance video showed two suspects gain entry by use of a silver Halligan bar and blue pry bar. The suspects can be seen wearing all black, one suspect wearing red gloves, one suspect wearing blue/purple gloves. No items were taken. Surveillance video showed a white Honda Civic with sunroof and Virginia tag ending in 3174 arrive and park directly in front of the door to the business. The Virginia tag (UKY-3174) was later reported stolen to Fairfax County Police Department in Virginia.

On January 25, 2022, Detective Gregory Miller of the Harrisonburg Police Department (Rockingham County, VA) obtained cell tower dump search warrants for AT&T and T-Mobile. A third warrant was obtained for Verizon on January 28th. The warrant sought cell tower business records for the area covering the locations of the January 19th pharmacy burglaries and the time frame around the burglaries – 1851 Virginia Avenue in Harrisonburg from 3:20 am-3:50 am, 590 Peter Jefferson Parkway in Charlottesville from 12:30 am to 2:00 am, and 16 Gosnell Crossing in Staunton from 2:30 am to 3:00 am. In his affidavit, Detective Miller described the similarities in the string of burglaries across neighboring counties from January 19th, including suspect descriptions, suspect vehicle description, descriptions of the specific pry tools used by the suspects and general modus operandi of the crimes. Detective Miller stated in the affidavit for these warrants that probable cause was based in part on his personal knowledge and in part on information provided by detectives in Albemarle County and August County.

On January 25, 2022, Detective Brian Hartman of the Howard County Police Department received a "be on the look-out" communication from the Harrisonburg Police Department (Rockingham County, Virginia) regarding the burglaries occurring on January 19th. After reviewing photographs from the different surveillance videos, Detective Hartman noted the similarities to the Howard County and Baltimore County burglaries in the modus operandi, the suspect and vehicle description, and the tools used to pry open business doors.

On January 26, 2022, Detective Hartman obtained a Geofence warrant directing Google to provide GPS, WiFi, and Bluetooth sourced location history data generated from devices that reported a location within a certain geographical region. The warrant limited the search parameters by date, time, and geographical region. Specifically, the search parameters were narrowed to the areas surrounding the January 5th and January 14th burglaries (maximum radius was 65 meters) and the requested window of time was limited to minutes (maximum was 25 minutes). When Detective Hartman received from Google the initial, limited anonymized information of devices within the geofence area ("Step 1")[2], he determined that there was no device information relevant to the burglary investigation[3]. Detective Hartman did not seek additional location information from Google (what is often referred to as "Step 2"), and he certainly never sought account-identifying information for the users of any of the listed devices ("Step 3") as he determined that they were not relevant to the investigation. As a result, Detective Hartman did not use the anonymized device information in any way in the investigation. In other words, the Geofence warrant was a dead-end.

---

[2] Google has developed a three-step process in responding to geofence warrants, providing to law enforcement an anonymous "list of all Google users whose Location History data indicates were within the geofence during a specified timeframe. *United States v. Chatrie,* No. 22-4489, 2025 WL 1242063, at *2 (4th Cir. Apr. 30, 2025).
[3] As Detective Hartman indicated in a report dated June 30, 2022, he did not receive the initial information from Google in response to the Geofence warrant until March 24, 2022.

D. **Louisa County and Harrisonburg Pharmacy Burglaries**

On February 8, 2022, at approximately 1:16 am, HCHC Pharmacy at 1380 Little Sorrell Drive in Harrisonburg, Virginia was burglarized. Exterior surveillance cameras captured a red Honda 2-door sedan suspect vehicle arrive on scene and two suspects: one wearing all black with white shoes using a blue pry bar; one wearing a black and gray hoodie, black jacket, black sneakers carrying a silver Halligan bar. Interior surveillance cameras captured the suspects inside where they stole $99 worth of controlled substances stolen including Hydrocodone-Acetaminophen (Schedule II), Adderall (Schedule II), and Promethazine-Codeine (Schedule V).

Later at approximately 3:29 am, the UVA Health Systems Pharmacy located at 1015 Spring Creek Parkway in Zion Crossroads, Virginia was burglarized. Surveillance video captured two suspects in dark clothing arrive in a red suspect vehicle and enter the business using a blue pry bar and silver Halligan tool. The suspects stole $25 worth of Promethazine-Codeine syrup.

At 4:00 am, the Food Lion Pharmacy located at 11010 Kentucky Springs Road in Mineral, Virginia was burglarized. Surveillance video from an external camera showed what appeared to be the same red suspect vehicle that was used in the earlier burglaries on this date. Surveillance video from an internal camera captured what looks like just one suspect in all black entering the business with the use of a Halligan tool. The suspect emptied a trash can in the pharmacy and used it to conceal stolen controlled substances - $8529 worth of drugs stolen including Adderall (Schedule II), Hydromorphone (Schedule II), Methylphenidate (Schedule II), Oxycodone HCL (Schedule II), Morphine Sulfate (Schedule II), Promethazine-Codeine (Schedule V).

On February 12, 2022, Detective Mark Stanton of the Louisa County Sheriff's Office obtained cell tower dump search warrants to be served on Sprint, T-Mobile and Verizon

authorizing the search of business records for cell sites servicing the areas of the two February 8th burglaries in his jurisdiction (UVA Health System and Food Lion Pharmacy), limiting the requested window of time for each geographic location to one hour and 15 minutes for the first location, and one hour for the second location. In his affidavit, Detective Stanton detailed the modus operandi of each of the two crimes as well as the third committed earlier in the morning in Harrisonburg (HCHC Pharmacy). From the results of the cell tower dump warrants, Detective Stanton identified a phone number around both Louisa County burglaries on February 8th – (240) 524-0022 (a pre-paid phone subsequently linked to Harold Dorman). A review of call detail records showed that at both burglary locations, the 0022 phone number was in contact with phone number (202) 440-3164, subscribed to William Sherod III.

Law enforcement now had two phone numbers of interest, and that information was shared with other law enforcement agencies who by then were working together to identify suspects in their respective burglary investigations.

On February 28, 2022, Detective Gregory Miller then obtained another set of cell tower dump search warrants, requesting data from just a 25-minute window within the coverage area of the February 8th burglary in Harrisonburg. In his affidavit, Detective Miller relied on facts from the burglary and the other burglaries committed on the same date in Louisa County, noting the similarities in the suspects descriptions, clothing, suspect vehicle, burglary tools and modus operandi. Detective Miller also stated in the affidavit that the probable cause was based on his personal knowledge of the investigation and information provided by Louisa County Detective Mark Stanton. In the affidavit, Detective Miller did not rely on any information from earlier cell tower dump warrants.

In March of 2022, Albemarle County Detective Nicholas Richardson obtained search warrants for real time location data for Sherod's 3164 phone number and the 002 number associated with Harold Dorman. In the affidavit, Detective Richardson included the results of the Louisa County cell tower dump warrants implicating the users of 3164 and 0022 phone numbers. Howard County Police obtains historical cell site location information for both phones, including the results from the Louisa County cell tower dump warrants that placed Dorman's 0022 phone at their burglaries. HCPD detectives start conducting surveillance on Sherod and Dorman's vehicles.

Through the months of February, March, and early April the pharmacy burglaries continued in various parts of Maryland and Pennsylvania, the motive operandi always the same. The continued sharing of information resulted in a collective knowledge among the law enforcement agencies in what appeared to be a related string of crimes. They used physical surveillance, real-time pinging of cellphones, and GPS trackers on suspect vehicles to further the investigation and home in on suspects. Finally on April 12, 2022, Sherod and his co-defendants were caught in the middle of committing another pharmacy burglary in Salisbury, Maryland. Sherod was acting as a look-out when he was approached by officers, lying to them about the reason for his presence on scene at 3:00 am. Sherod's co-defendants scrambled inside of the business looking for a way out of the building that was by then surrounded by police. All three defendants were finally captured.

II. **ARGUMENT**

   A.  **Geofence warrant**

Sherod's Motion to Suppress Evidence Obtained Pursuant to Geofence Warrant (ECF 104) is moot as no evidence was obtained from the search warrant. Google provided Detective Hartman with anonymized identifiers for devices that fell within the requested geofence area along with relevant coordinates and times. After reviewing the data provided, Detective Hartman determined

that the devices were not involved in the burglaries on January 5th and 14th. As a result, he ever requested additional identifying information from Google. No evidence was obtained from the Geofence warrant and no information from the warrant was used to obtain subsequent warrants. There is no evidence to be suppressed, and the defense's motion is moot.

### B. Cell Tower Dump Warrants

#### A. There is no Fourth Amendment Interest in short-term location information.

Sherod relies heavily on *United States v. Carpenter* in asking this Court to suppress evidence obtained from the various cell tower dump warrants. But *Carpenter* was a narrow ruling, one that the Court made clear did not apply to cell tower dumps. 585 U.S. 296, 316 (2018). The Supreme Court in *Carpenter* ruled that the government's acquisition of the defendant's historical cell site records for *127* days was a search under the Fourth Amendment and thus requiring a search warrant based on probable cause. *Id*.

The Supreme Court did not extend that ruling to cell tower dumps and in fact, some districts have held that a probable cause finding is not necessary to obtain such information. *See*, *United States v. Williams*, 741 F.Supp.3d 642, 649 (E.D. Mich. 2024) (court order directing service providers to perform tower dumps over a five-hour period for two tower locations was upheld as tower dumps require only "reasonable grounds to believe" the records are "relevant and material" to an ongoing investigation); *United States v. Rhodes*, 2020 WL 9461131, at *3 (N.D. Ga. June 18, 2020) ("information revealed by tower dumps obtained with a 2703(d) order do not present the Fourth Amendment concerns present in *Carpenter*.); *United States v. Pricop,* 2025 WL 918337, at *3 (D. Ariz. Mar. 26, 2025) ("Because the tower dumps here did not allow ATF access to "the whole" of anyone's movement, or anything close, the Court will not extend *Carpenter* to require probable cause for tower dumps.").

Sherod's motion accurately summarizes the concerns addressed in *Carpenter* – government access to comprehensive, all-encompassing record of a person's life. But the privacy interests at the center of that case are minimal here given the limited temporal and geographic scope. *See United States v. Adkinson*, 916 F.3d 605, 611 (7th Cir. 2019)(*Carpenter* did not invalidate warrantless tower dumps); *United States v. Lauria*, 70 F.4th 106, 129 n. 12 (2d Cir. 2023)(*Carpenter*'s ruling gives no reason to doubt that law enforcement officers lawfully could have obtained more limited cell tower information—for example, information simply telling whether defendant's phone was in the vicinity of the store at or near the time of the robbery— without need to show probable cause).

Sherod claims that by seeking warrants for the cell tower dumps in this case, "the government arguably has conceded that tower dumps invade cell-phone users' reasonable expectation of privacy." ECF 105 at 13. To be clear, the government makes no such concession. We do not believe that obtaining cell tower dump records is a search under the Fourth Amendment requiring a probable cause finding. It should not count against the government that investigators sought judicial approval in obtaining the records. *In the Matter of the Search of Information Associated with the Cellular Telephone Towers Providing Service to [Redacted] That is Stored At Premises Controlled by Verizon Wireless,* 616 F.Supp.3d 1 (D.C. 2022)(confronted with *Carpenter's* unanswered questions and conflicting authority, government's pursuit of search warrant for cell tower dump for less than two hours of location information while also positing that a warrant was not required was prudent).

B. Even if found to be a search, the warrants are supported by probable cause.

Probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (quoting

*Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). A judge's decision to issue a search warrant is reviewed with "great deference" -- they need only "a 'substantial basis' for finding probable cause." *United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019) (*quoting Gates*, 462 U.S. at 236–38, 103 S.Ct. 2317).

Here, a nexus existed between the location information sought in the cell tower dumps and the sweeping string of criminal activity outlined in the affidavits. The nature of the burglaries and the modus operandi in how they were committed established a clear link between them. The location data from nearby cell towers would provide helpful evidence in identifying the perpetrators. Sherod suggests that the affidavit must allege proof that a perpetrator carried a phone at the time of the crime, and further suggests that law enforcement must know which service provider a perpetrator of a crime used at the time. ECF 105 at 20-21. Requiring that level of proof belies the definition of probable cause – a concept that has "long been understood to encompass circumstances that, while less than a preponderance, 'warrant suspicion.'" *United States v. Gondres-Medrano*, 3 F.4th 708, 714 (4th Cir. 2021). Probable cause is thus "not a high bar." *United States v. Orozco*, 41 F.4th 403, 408 (4th Cir. 2022).

The facts before the reviewing judges here were that at least two conspirators carried out pharmacy burglaries in the middle of the night. One could logically infer from the manner in which these crimes were committed that they were pre-planned in great detail. As the affidavits indicated, it is common these days for individuals to have cellphones on their person. Even the court in *Riley v. California* recognized that in these modern times, cell phones "are such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." 573 U.S. 373, 385 (2014). *See also, United States v. James,* 3 F.4th 1102, 1105 (8th Cir. 2021)(regarding cell tower dump warrant in which defendant alleged

insufficient nexus because no proof of cellphone use by robber, court noted that the judges were not required to check their common sense at the door and ignore the fact that most people "compulsively carry cell phones with them all the time.") Given the facts of the investigation at the time, the reviewing judges had a substantial basis for believing that there was a fair probability that evidence of these burglaries would be found in the cell tower records.

    C. The warrants meet the particularity requirement.

The cell tower dumps in this case were particularized and tailored to each warrant's justifications, limited to the addresses of each burglary and requesting information for very short, relevant windows of time. In *United States v. James*, the court found the particularity requirement of the Fourth Amendment met in a cell tower dump warrant that covered only the cellular towers near each robbery. 3 F.4th 1102, 1106 (8th Cir. 2021). That is exactly what the investigators did in this case. Moreover, in *James*, the period of time requested for the locations was 90 minutes, much longer a period of time than the warrants covered here. Additionally, Sherod argues that the warrants permitted "access to an entire haystack because it may contain a needle." ECF 105 at 24. But in addition to the windows of time requested in the cell tower dump warrants being for very short periods, they were also time periods in the middle of the night (often between 2 and 3:00 am), further reducing the number of devices included in the returns. The warrants met the particularity requirement of the Fourth Amendment.

    D. The officers relied on the warrants in good faith.

Even if the Court has doubts that the warrant was supported by probable cause, the motion to suppress should be denied because the executing officers clearly relied in good faith on a facially valid warrant. *See United States v. Leon*, 468 U.S. 987, 992 (1984). Under the *Leon* good faith exception, "a court should not suppress the fruits of a search conducted under the authority of a

warrant, even a subsequently invalidated warrant, unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Bynum,* 293 F.3d 192, 195 (4th Cir. 2002). Officers are presumed to have acted in good faith except in certain narrowly defined circumstances: "(1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role . . . ; (3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *United States v. DeQuasie,* 373 F.3d 509, 519–20 (4th Cir. 2004) (internal quotation marks omitted).

Even in the context of a Geofence warrant, the court in *Chatrie* on rehearing en banc affirmed the lower court's finding that the good-faith exception applied to a Geofence warrant in which by all accounts the warrant and review process was a bit sloppy and the geographic and temporal limits of the requested information could have been further narrowed closer time to the robbery. *United States v. Chatrie,* No. 22-4489, 2025 WL 1242063, at *6 (4th Cir. Apr. 30, 2025). In his concurring opinion, Chief Judge Diaz wrote, "No doubt, the initial search here of over 500 million cell phone users is—to put it mildly—broader than the search of a handful of college students, but both warrants were issued to help identify the suspect of the crime. And in this case, law enforcement narrowed down the list of potential perpetrators at each step of the process from millions to dozens to a few based on the other relevant evidence. That rings in probable cause sufficient for me to find good faith." *United States v. Chatrie*, No. 22-4489, 2025 WL 1242063, at *7 (4th Cir. Apr. 30, 2025).

Similarly, here, the cell tower dump warrants were in no way so "facially deficient" of probable cause that the affiant could not have a reasonable belief as to its legality. The affiants detailed specific evidence from the surveillance videos of each pharmacy location which provided a link between them. Those facts alone provided a substantial basis for the issuing judge to make a probable cause determination that evidence would be found in the cell tower records. Even if the Court believes that the search warrant was not properly authorized, the agents' reliance on the warrant was reasonable.

### III. CONCLUSION

The Geofence warrant produced no viable evidence, and the information returned from Google was never used in obtaining any subsequent search warrants. The cell tower dump warrants fulfilled the probable cause and particularity requirements and the reviewing judges had a substantial basis for issuing them. As such, even if the court were to find that the cell tower dump warrants were deficient, the good faith exception applies and the motions should be denied.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _____/S/_____
Kim Y. Hagan
Sarah Simpkins
Assistant United States Attorneys